IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12 CR 603-1 |
| ) | |
| LAMONT COLBERT ) | Judge John Z. Lee |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Lamont Colbert has been indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922. He now moves to quash his arrest and to suppress a gun and a statement he made to police after his arrest pursuant to the Fourth Amendment and Federal Rule of Criminal Procedure 12(b)(3). He argues that the police lacked the necessary reasonable suspicion to stop and detain him before he revealed the gun and tossed it onto the sidewalk, and consequently, that the gun was the product of an unlawful seizure and his statement to the police was derivative of an illegality. The government contends that the police had the requisite reasonable suspicion to stop and investigate Defendant. For the reasons stated herein, the Court denies Defendant's motion.

## Facts

The facts are taken from the Chicago Police Department's ("CPD") Original Case Incident Report ("CPD Report") attached to Defendant's motion as Exhibit 1.[1] On March 7, 2012, at approximately 10:45 p.m., CPD Officers Ludwig and Gentile were on patrol near the intersection of East Marquette Road ("E. Marquette") and South Maryland Avenue ("S. Maryland") in Chicago, Illinois. (CPD Report 3.) The officers knew the area was a high-crime area and were aware that a homicide had taken place approximately one block away one day earlier. (*Id.*)

As the officers were driving in their patrol car westbound on E. Marquette Road, they saw a man near the corner on S. Maryland Avenue. (*Id.*) The man looked at the officers coming toward him and then turned and looked southbound on S. Maryland Ave. (*Id.*) The man then started yelling to another individual (later identified as Defendant) on S. Maryland Avenue. (*Id.*) The officers then observed Defendant run onto the porch of 6604 S. Maryland Avenue. (*Id.*)

According to the police report, the officers suspected Defendant might be armed with a firearm, so they went to the porch to speak with Defendant about the homicide that had occurred the day before. (*Id.*) Defendant was sitting on the porch with his hands in his pockets. (*Id.*) The officers asked him numerous times to remove his hands from his pockets. (*Id.*) Defendant refused to show his hands to the officers, and the officers then ordered him to show his hands as

---

[1] Defendant relied on the CPD Report to set forth the facts in his motion, but Defendant noted that "[i]f this motion were to proceed to a hearing, the defense would call the Chicago Police Officers to sustain its burden for suppression." (Def.'s Mot. Quash & Suppress, Ex. 1, CPD Original Case Incident Report ("CPD Report"), 2 n.1.) Additionally, in his reply, Defendant stated that "although in his motion [Defendant] cited to police reports generated in this case, he is not adopting that the allegations contained in the reports are true." (Def.'s Reply 1.) Rather, he is simply arguing that under the police officers' version of events, and if the police testified consistently with their reports at an evidentiary hearing, the Court should grant his motion. (*Id.*)

they approached him. (*Id.*) Defendant then reached with his right hand underneath his right leg, removed a blue steel revolver, and tossed it onto the sidewalk in front of the residence. (*Id.*)

Officer Ludwig immediately recovered the firearm from the sidewalk and found it loaded with six live rounds. (*Id.*) Defendant was then placed into custody and taken for processing. (*Id.*) After he was advised of his Miranda rights, Defendant told the officers, "I have the gun because my little brother got killed yesterday." (*Id.*)

Defendant now moves to quash his arrest and suppress the gun and his statement, arguing that Officers Ludwig and Gentile lacked reasonable suspicion to stop and investigate him.

## Discussion

### I. Reasonable Suspicion

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Ker v. Cal.*, 374 U.S. 23, 30 (1963), provides in pertinent part that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated..." U.S. Const. amend. IV. Police can stop and detain an individual for investigative purposes without violating the Fourth Amendment pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *Terry* stops are permissible if the officer has a "reasonable suspicion" supported by articulable facts that criminal activity is afoot. *Id.* at 21-22. While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. *U.S. v. Sokolow*, 490 U.S. 1, 7 (1989). "In other words, reasonable suspicion is less than probable cause but more than a hunch." *U.S. v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (citing *U.S. v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

In determining whether the police officers had reasonable suspicion to make the stop, the Court must examine the totality of the circumstances known to the officers at the time of the stop. *Lawshea*, 461 F.3d at 859.[2] In so doing, we must be mindful that "certain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." *Id.*

In this case, at the time of the incident, Officers Ludwig and Gentile were on patrol at approximately 10:45 p.m. in a high-crime area. (CPD Report 3.) Indeed, there had been a homicide by firearm the previous day within one block of where they were on patrol. (*Id.*) While being present in a high-crime area cannot, in and of itself, support a particularized suspicion that a subject is committing a crime, an officer is permitted to consider a location's characteristics when assessing the situation. *U.S. v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (citing *Ill. v. Wardlow*, 528 U.S. 119, 124 (2000)).

While they were on patrol, Officers Ludwig and Gentile observed a man on the corner of E. Marquette and S. Maryland Avenue look toward them, turn and look southbound on S. Maryland Avenue toward Defendant, and yell toward Defendant. (CPD Report 3.) Defendant then ran onto the porch of a residence on S. Maryland Avenue. (*Id.*) The Supreme Court has recognized that evasive behavior, including unprovoked flight, "is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124-25 (reasonable suspicion existed to stop a person who fled upon seeing officers patrolling an area known for heavy drug trafficking). Defendant offers no explanation for why he ran when he did. To the officers, the man standing on the corner appeared to be a look-out for Defendant, warning Defendant of the officers' presence by first seeing the officers and then turning and yelling toward Defendant, at

---

[2] The government does not contest that the police officers' actions in approaching and questioning Defendant on the porch constituted a *Terry* stop in the first instance. (Gov't Resp. at 5.)

4

which time Defendant began to run. Defendant's behavior, considered in light of the surrounding circumstances, including the late hour, the high-crime nature of the area, and the shooting in the vicinity just a day before, was sufficient to create a reasonable suspicion for the officers to stop and investigate Defendant. *See Lawshea*, 461 F.3d at 859 ("[Defendant's] flight from [the police officer] in a high-crime area just before midnight gave the officer a reasonable suspicion to stop [Defendant] . . . Since *Wardlow*, we have made it clear that when a suspect attempts to flee from the police, the officers have reasonable suspicion to pursue the suspect in order to conduct a *Terry* stop."); *Lenoir*, 318 F.3d at 729 ("a person's flight upon seeing the police approach in a high crime area establishes reasonable suspicion to justify a *Terry* stop.")

Defendant nevertheless argues that the officers lacked reasonable suspicion because Defendant did not "flee" from the police but simply ran onto a porch and sat down. (Def.'s Mot. Quash & Suppress 6.) But Defendant began running away from the officers when the man on the corner appeared to have alerted Defendant of their presence. Running upon noticing the police is highly evasive behavior. *See Wardlow*, 528 U.S. 119 at 124 ("Headlong flight – wherever it occurs – is the consummate act of evasion"). Furthermore, courts regularly find evasive behavior short of the type at issue here sufficient to warrant a *Terry* stop. *See, e.g., Oglesby*, 597 F.3d at 894 (finding defendant's actions in slowly taking a few steps away from a group while looking from side to side and angling his body away from the police officers were pertinent factors in determining reasonable suspicion); *U.S. v. Harris*, 188 Fed. Appx. 498, 501-02 (7th Cir. 2006) ("We have held that walking away quickly in the face of commands by police officers to stop is evasive behavior that contributes to the reasonableness of an officer's suspicion."); *U.S. v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) (holding that the officer had reasonable suspicion to conduct a *Terry* stop and concluding that "[i]t was also reasonable for

5

[the officer] to interpret the [defendant's] vehicle's sudden acceleration as evidence of unprovoked flight"); *U.S. v. Mays*, 643 F.3d 537 (6th Cir. 2011) ("flight is not the only type of 'nervous evasive behavior.' Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions.") (internal citations omitted); *U.S. v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (noting that courts can consider "evasive conduct that falls short of headlong flight" and holding that defendant's "evasive conduct" included "immediately walk[ing] away as the officers approached, and although [defendant] did not run, he walked away at a quick pace, ignoring the officer's commands to stop.") Thus, Defendant's actions, coupled with the circumstances already described, provided the officers with reasonable suspicion to stop and investigate him pursuant to *Terry*. *See Wardlow*, 528 U.S. at 124-25; *U.S. v. Lenoir*, 318 F.3d at 729.

Defendant nevertheless argues that, when the officers first approached him on the porch and asked him to remove his hands from his pockets, his refusals to comply cannot contribute to the calculation of reasonable suspicion because he was not legally obligated to follow their requests. (Def.'s Reply 2-3.) For support, Defendant points to *Florida v. Royer*, where the Supreme Court recognized the long standing principle that an individual has a right to ignore a police officer's requests when the officer approaches the individual without reasonable suspicion or probable cause. 460 U.S. 491, 498 (1983) (noting that an individual "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those ground"). But, here, the police officers already had reasonable suspicion when they approached Defendant on the porch and asked him to remove his hands from his pockets. Furthermore, Defendant's continued refusal to answer the officers' questions and show his hands before removing the revolver from his right leg and discarding it

6

only heightened the suspicion rather than dispelling it. (CPD Report 3.) *See Lawshea*, 461 F.3d at 860-61.

In sum, the totality of the circumstances provided the officers with a reasonable suspicion that Defendant was armed or otherwise engaged in unlawful activity and, based upon this reasonable suspicion, the officers were permitted to stop and investigate Defendant without violating the Fourth Amendment under *Terry v. Ohio*. Therefore, Defendant's arrest and the seizure of the firearm were predicated upon a lawful seizure, and the post-Miranda statement made by Defendant after his arrest was not derived from illegality.

## II. Evidentiary Hearing

When a defendant in a criminal case brings a motion to suppress, a district court may conduct an evidentiary hearing on the motion.[3] *U.S. v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007). A district court is required to conduct a hearing only "when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *Id.* (citing *U.S. v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004)). The defendant bears the burden of identifying a "definite disputed factual issue" and demonstrating its materiality. *Id.*

Here, Defendant does not challenge any of the factual allegations in the police report.[4] Defendant challenges only whether the facts as presented in the police report established reasonable suspicion to stop Defendant. Because Defendant has not identified a disputed issue

---

[3] Defendant does not ask for an evidentiary hearing and only notes in a footnote that "[i]f this motion were to proceed to a hearing, the defense would call the Chicago Police Officers to sustain its burden for suppression." (Def.'s Mot. Quash & Suppress 2 n.1.)

[4] *See* Footnote 1, *supra*.

of material fact that would affect the outcome of the motion, the Court finds that no evidentiary hearing is necessary.

## Conclusion

For the reasons herein, the Court denies Defendant's motion to quash arrest and suppress certain evidence [24].

**SO ORDERED**  ENTER: 12/27/12

_____
**JOHN Z. LEE**
**U.S. District Judge**